*218 OPINION OF THE COURT
Jones, J.
We hold in this case that the denial by the Commissioner of Agriculture and Markets of a license to extend delivery of milk on a wholesale basis into the County of Richmond to a New Jersey dealer already licensed to supply and supplying milk in other counties of the State did not violate the commerce clause of the United States Constitution.[1]
The dealer appeals as of right on constitutional grounds in a proceeding pursuant to CPLR article 78 from a judgment of the Appellate Division which unanimously confirmed the determination by the commissioner, after a hearing, denying petitioner’s application for an extension of its milk dealer’s license into Richmond County and dismissed the petition which sought annulment of the denial.
Petitioner Tuscan, a New Jersey corporation, is a processor and seller of milk and milk products doing business in New Jersey, New York, Delaware, Pennsylvania and Massachusetts. It holds a milk dealer’s license issued by the Department of Agriculture and Markets of the State of New York and for some 20 years has made wholesale deliveries of milk and milk products into Orange and Rockland Counties and deliveries of other dairy products in most of the remaining counties in the State. Its present business in the State is wholesale only, and its customers include supermarkets, institutional outlets serving schools and hospitals, and the so-called "mom and pop stores”.
After Pathmark, one of the supermarket chains to which it delivered its products in New Jersey, had requested it to undertake supplying the chain’s stores on Staten Island (Richmond County), on May 28, 1975 petitioner filed an application for an extension of its milk dealer’s license with the Commissioner of Agriculture and Markets of this State so that it might make deliveries at wholesale in that county. In accordance with section 258-c of the Agriculture and Markets Law, governing the licensing of milk dealers,[2] on July 15, 1975 a *219 hearing was held, at which witnesses and exhibits were presented by petitioner and by the Department of Agriculture and Markets, directed to the questions "whether the issuance of the license extension will tend to a destructive competition in a market already adequately served, or the issuance is in the public interest; and whether the applicant is qualified by character or experience or financial responsibility or equipment properly to conduct the proposed business”.
The department presented nine witnesses, one of whom was a statistician who introduced and explained figures produced by a milk market survey of Richmond County conducted in the year prior to the hearing; the remaining witnesses were officers or employees of milk distributors already licensed to serve and which were serving Richmond County, who testified in detail as to the nature and extent of business each was doing there and as to the competition existing and its consequences, as well as the consequences of the entry of a new distributor into the area. Petitioner offered no testimony on these subjects and produced only three witnesses: an employee of its customer Pathmark, who testified concerning the request made to petitioner to begin distribution in Richmond County; petitioner’s accountant, who attested to the firm’s financial reports; and petitioner’s chairman of its board, who described its operations, licenses and equipment. At the close of the hearing petitioner requested and was granted the right to call additional witnesses at a later session of the hearing; however, petitioner subsequently advised that no further witnesses would be called and the hearing was not resumed. Thereafter respondent commissioner, with the consent of petitioner, acting without a report by the hearing officer (who had transferred from the department) but on the basis of the transcript and exhibits, made a determination denying the license application on finding that granting petitioner’s application for an extension to serve at wholesale in Richmond County "would tend to a destructive competition for milk sales in a market already adequately served and as such would not be in the public interest”. The commissioner fur *220 ther found that it could "not be concluded that applicant’s request for extension of its milk dealer’s license to Richmond County should be denied for reason of character or experience or financial responsibility or equipment properly to conduct the proposed business”.
Petitioner has thus far sought without success to overturn the commissioner’s denial of its application for an extension of license. On its present appeal it sets out two challenges: (1) that the commissioner’s determination is not supported by a preponderance of the evidence before him as required by section 258-c of the Agriculture and Markets Law, and (2) that the commissioner’s application of the statute to petitioner in this case violates the commerce clause of the United States Constitution.
Specifically, the commissioner concluded: "The entry of another substantial processor-distributor of milk to Richmond County with primary interest in serving larger-volume supermarket accounts would under existing circumstances, tend to a destructive competition for sales of milk. It is concluded that there would be considerable pressure exerted by the applicant to establish a foothold in the market. This, along with the likelihood of competitive reaction by established dealers, would have a price-depressing effect on the market with destructive impact upon medium-size and smaller-volume milk dealers. These dealers perform an important function. The public interest requires that a balanced milk distribution structure be maintained in the market, so that service on retail home delivery routes and service to small volume wholesale customers is readily available. This type of service entails much higher unit costs than service to high volume supermarket accounts. There is an inevitable tendency for the larger milk dealers to attempt to skim the profitable supermarket accounts and neglect service to smaller volume accounts. The applicant does not perform any retail home delivery services. The public interest in maintaining a balanced milk distribution structure within Richmond County, adequate to serve all the needs of the market, would not be served by granting the application for extension.”[3] The commissioner then determined "that granting the application of Tuscan Dairy Farms Inc. for extension of its milk dealer’s *221 license to serve at wholesale in Richmond County would tend to a destructive competition for milk sales in a market already adequately served and as such would not be in the public interest”.
We agree with the Appellate Division that this determination is supported by a preponderance of the evidence before the commissioner. Several of the milk distributors summoned by the department who variously serviced small stores, luncheonettes, fruit and vegetable stands and retail home customers, recited statistics which showed a decline in milk distribution business in the preceding two years. The distributor doing the largest volume of business in the area had closed its pasteurizing plant in Richmond County three months before the hearing due to a lack of sufficient volume to operate the plant efficiently. There was ample testimony of intense competition and price wars in the sale of milk in Richmond County and proof that each time a new distributor entered the area a price competition ensued as a result of the entrant’s attempt to build a market for itself by undercutting existing prices followed by the responsive reduction in prices, first by the outlets being serviced by the newcomer, then by competitors of those outlets and their suppliers. A distributor serving "mostly little deli’s and the mom and pop stores”, also engaged in retail delivery of milk, testified that such price competition not only caused the mom and pop stores to suffer badly but that his own business suffered because he had to sell milk more cheaply in order to sell it at all, so that the sale of milk at the time when there was a price war caused by a new supplier was not profitable and "we are just trying to hold our heads above water”. His statement that he was nevertheless going to continue in his business was apparently explained by his remark "I have been lucky. I have managed to pick up a couple of good stores.” Additionally, there was testimony by the manager of the distributor that had recently entered the area and which serviced only small outlets that it was finding the competition "very tough” and had acquired fewer customers than it had anticipated when it had been licensed. He stated that retail home delivery business requires much more mileage on the distributor’s trucks than does store business, which is a direct run.
As previously indicated, petitioner produced no evidence of its own as to the consequences which might be expected to follow the licensing of an additional distributor. It now at *222 tempts only to impeach the probative worth of the testimony of the department’s witnesses, emphasizing their position as potential competitors of petitioner whose testimony should be subjected to particular scrutiny by reason of that circumstance.
As a public official with expertise in the area of marketing and distribution of dairy products, the commissioner found that the public interest requires the maintenance of a balanced distribution system, including availability of service to retail home delivery routes and small volume wholesale customers. The direct evidence, together with the inferences reasonably to be drawn therefrom, supports the conclusion that introduction in Richmond County of a new distributor of milk to supermarkets only — with adverse effect on distributors presently serving small retailers and themselves engaged in retail sales — would tend to a competition for milk sales which would be destructive by reason of the potential disturbance of the balanced distribution structure. The licensing of petitioner to enable it to serve its customer Pathmark, a supermarket chain, would do nothing to counteract this disturbance, inasmuch as it was the maintenance of distribution to small outlets and retail sellers that would be jeopardized, and no proof was offered that petitioner would serve those outlets and sellers. Such proof as there was, was to the contrary. Thus, to the extent that petitioner challenges the commissioner’s observation and reliance on the fact that petitioner does not itself render any retail home-delivery services, it is notable that this fact was testified to by one of petitioner’s own witnesses and that petitioner offered no proof whatsoever that it desired or intended to service other than supermarkets in Richmond County. In its brief petitioner even now stresses that its application was limited to sales "at wholesale”.
On the basis of the evidence introduced by the department, taken with the petitioner’s failure to offer any countervailing evidence, we reject petitioner’s argument that the commissioner’s determination was not supported by the preponderance of the evidence before him.
Turning then to petitioner’s claim that the commissioner’s determination violates the commerce clause of the Federal Constitution, we look to the decisions and opinions of the Supreme Court of the United States. We find no decision of that court which is squarely dispositive. The cases which have upheld State regulation of commerce in milk and dairy prod *223 ucts against challenges under the commerce clause have presented predominantly issues of local price regulation, and are thus distinguishable from the present case. In Highland Farms Dairy v Agnew (300 US 608) the licensing requirement of a Virginia milk control statute and the milk prices fixed by the commissioner created under the statute were found by provisions of the law itself and by the commissioner’s application thereof to be inapplicable to a challenging interstate milk distributor. In Milk Bd. v Eisenberg Co. (306 US 346) it was held that Pennsylvania’s statutory economic regulation of its local milk industry, including the licensing and bonding of milk dealers and the establishment of prices paid to producers, could constitutionally be applied to milk dealers engaged exclusively in interstate commerce. In State v Pure Vac Dairy Prods. Corp. (251 Miss 457, app dsmd for want of a Federal question sub nom. Pure-Vac Dairy Prods. Corp. v Mississippi ex rel. Patterson, 382 US 14) the application of a Mississippi milk price control statute to a Tennessee producer shipping milk into Mississippi for sale there was approved. In United Dairy Farmers v Milk Control Comm. (404 US 930) the Pennsylvania milk control law was again upheld, this time against claims that it deterred out-of-State producers from shipping milk into Pennsylvania. Similarly, from the opposite view, none of the cases discussed below, in which State regulation of the milk industry has been struck down, has presented a factual context or regulation of a sort comparable to that in the present case.
 Petitioner does not dispute that the milk industry within the State is a proper subject for regulation under the State’s police power (e.g., Nebbia v New York, 291 US 502). It contends, however, that, when the purpose of the exercise of the State’s authority is economic regulation, any obstruction of interstate commerce — whether direct or indirect, substantial or incidental — is invalid under the commerce clause. As a consequence, it urges that the Appellate Division erred when petitioner contends, it applied a balancing of interests test— weighing the effect on interstate commerce against local benefit — and upheld the commissioner’s denial of the opportunity to petitioner to distribute milk at wholesale in Richmond County.[4]
*224 There is unquestioned authority, on which petitioner relies, for the proposition that legislation enacted solely for the protection of local economic interests by the restriction of competition from without the State is inherently unconstitutional. Thus, in Baldwin v G. A. F. Seelig (294 US 511) the Supreme Court held invalid a New York regulation which prohibited the sale of milk imported from other States, there Vermont, unless the purchase price paid to the out-of-State farmer was at least equal to that paid to New York farmers. The regulation, which the Supreme Court in a subsequent case described as "an enactment aimed solely at interstate commerce attempting to affect and regulate the price to be paid for milk in a sister state” (Milk Bd. v Eisenberg Co., 306 US 346, 353, supra), was denounced as a tariff barrier hostile to the national economic solidarity.
"The argument is pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when the farmers of the state are unable to earn a living income. Nebbia v. New York, supra. Price security, we are told, is only a special form of sanitary security; the economic motive is secondary and subordinate; the state intervenes to make its inhabitants healthy, and not to make them rich. On that assumption we are asked to say that intervention will be upheld as a valid exercise by the state of its internal police power, though there is an incidental obstruction to commerce between one state and another. This would be to eat up the rule under the guise of an exception. Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.” (Baldwin v G. A. F. Seelig, 294 US 511, 522-523, supra.)
*225 Fourteen years later Hood & Sons v Du Mond (336 US 525) involved the denial under section 258-c of the Agriculture and Markets Law of a license sought by a Massachusetts corporation for construction in New York of a milk receiving depot at which raw milk would be collected for shipment to Boston. Invalidating the denial of license the Supreme Court found that it had been "for the avowed purpose and with the practical effect of curtailing the volume of interstate commerce to aid local economic interests” (336 US, pp 530-531; emphasis added).
Similarly in A & P Tea Co. v Cottrell (424 US 366) the court struck down the denial of a Louisiana milk producer’s permit to distribute in Mississippi milk products from Louisiana, which denial was predicated on the absence of a reciprocity agreement with respect to sales of milk between the States of Louisiana and Mississippi, action prompted by an evident concern for the economic welfare of milk dealers in the regulating State. Applying a balance of interests test, the court found unconstitutional the total prohibition of entry of foreign milk used as a weapon to force a sister State into a reciprocity agreement.
Each of the cases discussed, as well as others also relied on by petitioner, involved State action that was found to have had as its avowed purpose the exclusion of competition from out of State for the protection of the economic well-being of the milk industry within the State. Additionally, in the Baldwin and A & P Tea Co. cases the challenged action sought to affect, and, thus in a degree significantly to control, the commerce in milk in a State other than the regulating State. In Baldwin, it was New York’s intention to affect commerce in milk in Vermont; in A & P Tea Co. it was Louisiana’s intention to affect commerce in milk in Mississippi.
Quite a different situation is presented by the case now before us. Of cardinal and distinguishing significance, which petitioner would have us overlook, is the fact that the commissioner’s denial of the license sought by petitioner did not have as its objective the economic protection of the milk industry of New York State, or even that of the County of Richmond. The commissioner’s concern in this instance was addressed rather to the maintenance of the existing "balanced milk distribution structure”, and particularly that portion of the present distribution system which provides "service on retail home delivery routes and service to small volume wholesale customers,” the *226 small outlets and the mom and pop stores, which individually and collectively serve consumer needs not met by supermarkets and warehouse-type outlets. "The public interest requires that a balanced milk distribution structure be maintained in the market, so that service on retail home delivery routes and service to small volume wholesale customers is readily available.” Because petitioner’s interest is in distribution only through supermarkets and wholesale outlets, its entry into Richmond County would not contribute to the maintenance of such a balanced distribution system or provide services equivalent to those now available to the consumers. Thus, the denial of license here is not for the benefit of the dealers and distributors presently serving the market, but for the protection of the welfare of the customers, in the public interest. Although it may be assumed that the denial of a license to a new supplier seeking to break into the market area will incidentally provide a measure of economic protection to businesses already operating within the existing system (whether engaged in interstate or intrastate commerce), this intermediate consequence should not serve to abrogate the ultimate, legitimate objective of preserving a distribution system necessary to serve the varied needs of milk consumers in Richmond County, when economic protection of the local industry was not the purpose which the denial sought to accomplish.
The possibility of incidental economic benefit to the present milk industry should not be fatal to the validity of State regulation for consumer protection particularly when, as here, the determination implementing the objective was not dependent on the fact that petitioner’s product, if permitted, would be shipped from an out-of-State source. Thus — and closely related to the absence of a motive to protect local industry— the denial of petitioner’s application was not in pursuit of an exclusion of or discrimination against competition originating without the State (cf. City of Philadelphia v New Jersey, 437 US 617). So far as appears, petitioner’s status as a New Jersey corporation proposing to ship milk from outside the State into the metropolitan New York area was in no way a factor on which the challenged determination was grounded. No prohibition of goods traveling across State borders was sought to be accomplished; the restriction was only against the particular method of distribution of milk in Richmond County, whether the milk came from within or without *227 the State. Nothing suggests that the negative response petitioner’s application received would have been any different had the applicant been a New York wholesaler seeking to distribute milk produced and processed within New York. The fact that the denial of the application resulted in exclusion from the Richmond County market of milk which would have been shipped in interstate commerce was only a happenstance occasioned by the identity of this applicant; it was not the raison d’etre of the commissioner’s action. There was testimony that at least one supplier presently operating in Richmond County is, like petitioner, based in New Jersey. Petitioner itself is licensed and conducts extensive business in New York, engaged as it is in wholesale distribution of milk or milk products in most of the counties of the State. (Cf. Exxon Corp. v Governor of Md., 437 US 117, 129.)
Section 258-c of the Agriculture and Markets Law on its face does not discriminate with respect to the activities of intrastate and out-of-State suppliers as tending to a destructive competition in a market already adequately served, on the basis of which licensing may be withheld. No reference is made in the statute to the source of the competition, whether from within the State or without. That the absence of such a distinction is a significant factor in viewing applications of the statute adverse to an out-of-State dealer, see Panhandle Co. v Michigan Comm. (341 US 329, 337). Moreover, and equally significant, nothing in the record indicates that the commissioner’s application of the statute in this instance or in general has been other than evenhanded in treatment of interstate and intrastate commerce alike.
Finally there is no suggestion — and could be none — that the statute or its application to petitioner represents any attempt at extraterritorial control of trade or commerce. Unlike Baldwin (294 US 511, supra) and A & P Tea Co. (424 US 366, supra) there is here no aspiration to affect or regulate the milk industry outside the boundaries of New York. In Baldwin the intention and consequence of the New York regulation was to maintain the level of prices paid for milk in Vermont. In A & P Tea Co. the intention and consequence of Louisiana’s regulation was to open the markets of Mississippi to Louisiana milk. Unlike Hood, in which the result of New York regulation would have been to interfere with the supply of milk to Boston, there is here no demonstrated impact on a milk *228 market outside the borders of New York State. In the present instance, neither by intention nor by consequence, by exclusionary requirement or by enticement, is there any demonstrated influence on the sale of milk in New Jersey or in any other State. The denial of distributor’s license under section 258-c focuses entirely on the community sought to be served by the applicant and on the protection of the present balanced milk distribution structure for comsumer benefit.
 We recognize that the denial of this New Jersey petitioner’s application to distribute milk on a wholesale basis in Richmond County has some incidental effect on interstate commerce. Balancing this incidental impact against the interest of the State of New York in protecting milk comsumers in Richmond County, however, we conclude that where the purpose and goal of the restriction employed is consumer protection and not the economic well-being of the present milk industry, and the means chosen does not involve an attempt to control commerce in another State or otherwise to produce an extraterritorial effect and does not operate to discriminate against or place an embargo on interstate commerce, the obvious local interest at stake outweighs whatever national interest there might be in the prevention of the State restrictions (Cities Serv. Co. v Peerless Co., 340 US 179, 186-187). In the analysis most recently articulated by the Supreme Court in A & P Tea Co. v Cottrell (424 US 366, 371-372, supra), if a court finds that a challenged exercise of local power serves to further a legitimate local interest but simultaneously burdens interstate commerce, it is confronted with a problem of balance. The general rule which then becomes applicable can be phrased as follows (424 US, pp 371-372): "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. * * * If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.” (Cf. City of Philadelphia v New Jersey, 437 US 617, supra.) We conclude that the denial of petitioner’s application for an extended license in the present instance passes this test.
*229 One further word should be written with respect to Hood & Sons v Du Mond (336 US 525, supra), a case heavily relied on by petitioner. Examination of the record in that case, and particularly the findings of fact and conclusion of the then Commissioner of Agriculture and Markets, reveals that the concern there was wholly with protection for local milk dealers; there was no aspect of attention to consumer protection, the motivating objective in the present case. The testimony before the commissioner was as to possible shortages of milk supply to the local dealers rather than to consumers. The commissioner concluded that the three milk plants near the site of Hood’s proposed new plant had "the capacity to handle more milk than they are now handling”, and "that one of the factors affecting the economy of operating county milk plants, is the volume of milk handled, * * * 'In each case the volume of milk received at the individual plants was by far the most important factor affecting the cost per 100 pounds.’ ” The summary conclusion was
"If applicant is permitted to equip and operate another milk plant in this territory, and to take on producers now delivering to plants other than those which it operates, it will tend to reduce the volume of milk received at the plants which lose those producers, and will tend to increase the cost of handling milk in those plants.
"If applicant takes producers now delivering milk to local markets such as Troy, it will have a tendency to deprive such markets of a supply needed during the short season.” Thus, the focus of the commissioner’s attention was exclusively on the adverse impact which the erection of a new plant in the area would have on the existing milk plants. Baldwin had previously established that economic disadvantage generally to the milk industry could not be accepted as justification for burdening interstate commerce, even though it could be argued that "the maintenance of a regular and adequate supply of pure and wholesome milk” (294 US, p 523, supra) might thereby be put in jeopardy. Thus, economic protection of milk dealers, the objective of the denial of the license in Hood, would not support the State regulation.
One looks in vain in Hood for any translation of economic disadvantage to dealers into injury to customers. The commissioner’s determination does not mention consumers; the opinions in our court (297 NY 209) and in the Supreme Court (336 US 525) do not mention or address the subject of consequences *230 to consumers or consumer protection. Thus, it is entirely understandable that the Supreme Court there concluded that the restriction was (p 530) "imposed for the avowed purpose and with the practical effect of curtailing the volume of interstate commerce to aid local economic interests.” It is determinative that in the present case, the objective of the commissioner’s action was the maintenance of a balanced milk distribution structure for the protection of the consumer-public, not the erection of parochial barriers to safeguard the economic well-being of local dealers. Additionally, in Hood the denial of the desired license would have had the inevitable extraterritorial effect of interfering with the distribution of milk in the Boston area, a factor of out-of-State impact for which there has been no demonstrated counterpart in the present case.
For the reasons stated, the judgment of the Appellate Division should be affirmed, with costs.

.(US Const, art I, § 8, subd 3.)

.Section 258-c of the Agriculture and Markets Law, insofar as relevant, provides: "No license shall be denied to a person not now engaged in business as a milk dealer, or for the continuation of a now existing business, and no license shall be denied to authorize the extension of an existing business by the operation of an additional plant or other new additional facility, unless the commissioner finds by a preponderance of *219 the evidence, after due notice and opportunity of hearing to the applicant or licensee, one or more of the following: (1) that the applicant is not qualified by character or experience or financial responsibility or equipment properly to conduct the proposed business * * * (2) that the issuance of the license will tend to a destructive competition in a market already adequately served; or (3) that the issuance of the license is not in the public interest.”

.A related conclusion by the commissioner that "the market is already adequately served” is not challenged by petitioner.

.No contention is advanced by petitioner that the protection the commissioner seeks to accord the milk distribution system in Richmond County could have been promoted by any alternative means having a lesser impact on interstate activities.